United States District Court
Southern District of Texas

**ENTERED**

July 21, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMANDA SUMMERS., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-15-338 |
| | § | |
| CAROLYN W. CALVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No.21), Defendant's Response to Plaintiff's Motion for Summary Judgment (document No. 22), and Defendant's Motion for Summary Judgment (Document No.12) and Memorandum in Support (Document No. 13). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No.12) is DENIED, Plaintiff's Motion for Summary Judgment (Document No.21) is GRANTED, and the decision of the Commissioner is REMANDED for further proceedings.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on July 13, 2015. (Document No. 10).

## I. Introduction

Plaintiff, Amanda Summers, ("Summers") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income. Summers argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Susan J. Soddy, committed errors of law when she found that Summers was not disabled. According to Summers, the ALJ failed to find that her mental impairments, including mild mental retardation/borderline intellectual functioning, learning disorder and severe ADHD and mood disorder  meets or equals the requirements of Listing 12.05 because she was unable to establish that she has deficits in adaptive functioning.  She further argues that the ALJ's residual functional capacity assessment fails to properly accommodate for her impairments.  Summers seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Summers was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On October 25, 2011, Summers filed for disability insurance benefits and supplemental security income on September 15, 2011, claiming she has been disabled since January 1, 1996. (Tr. 155-157, 158-166). The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr.57-61, 62-66, 74-77, 78-81). Thereafter, Summers requested a hearing before an ALJ. (Tr. 82-84). The Social Security Administration granted her request, and the ALJ

2

held a hearing on March 6, 2013. (Tr. 29-52). Summers did not appear at the hearing. Present at the hearing were her counsel and a vocational expert testified. Because Summers failed to appear at the hearing, the ALJ sent a Notice to Show Cause for Failure to Appear. (Tr. 149-153). Summers's counsel responded to the Show Cause Order and stated that Summers waived her right to appear at a supplemental hearing. On November 29, 2013, the ALJ issued a decision finding that Summers was not disabled. (12-28).

Summers sought review by the Appeals Council of the ALJ's adverse decision. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused her discretion; (2) the ALJ made an error of law in reaching her conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. The Appeals Council, on November 21, 2014, concluded that there was no basis upon which to grant Summers's request for review. (Tr. 1-3). The ALJ's findings and decision thus became final. Summers has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No.12) and a Memorandum in Support (Document No. 13). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 21), to which Defendant has filed a Response. (Document No. 22). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 315. (Document No. 7). There is no dispute as to the facts contained therein.

## III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether

substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"

4

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in her November 29, 2013, decision that Summers was not disabled because she has the residual functional capacity ("RFC ") to perform a full range of work with restrictions and that she could perform jobs such as an office cleaner, a dishwasher, and a laundry press operator. In particular, the ALJ determined that Summers has not engaged in substantial gainful activity since January 1, 1996, her alleged onset date; (step one); that Summers's mild mental retardation/borderline intellectual functioning, attention deficit hyperactivity disorder, learning disorder and mood disorder are severe impairments but that suspected fracture in the right tarsal navicular bone from March 2008, a renal stone in March 2009, right flank pain in June 2011, and tooth pain in January 2013 are non-severe impairments (step two); that Summers does not have

6

an impairment or combination of impairments that met or medically equaled one of the listed impairments, 12.04 or 12.05, in Appendix 1 of the regulations (step three); based on the record that Summers has the RFC to perform a full range work at all exertional levels with restrictions. The ALJ found that Summers "is limited to simple, routine tasks that require no more than occasional contact with the public. She cannot work a fast-paced, assembly type, production jobs. She cannot work in any job that requires reading or writing above the first grade level." (Tr. 20). The ALJ found that Summers has no past relevant work (step four). The ALJ further found that based on Summers's, age, limited education and ability to communicate in English, work experience, RFC, and the testimony of a vocational expert, that there are jobs, which exist in significant numbers in the national and regional economy, that Summers is capable of performing such as an officer cleaner, a dishwasher, and a laundry press operator, and was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

The record is scant. (Tr. 269-275). School records from Calhoun County Board of Education, Anniston, Alabama relate to Summers's eligibility for special education services. (Tr. 174-177). The records show that a Wechsler Intelligence Scale for Children-III was completed on May 29,

1998. According to the school record "behavior testing November 15, 1998 and February 7, 2002, identified areas of concern: off task behavior, seeks excessive attention, difficulty attending, and makes derogatory comments to others." (Tr. 174). Summers was diagnosed with ADHD. As for grade levels, for writing she was at the grade one level and grade two level for spelling. (Tr. 174).

On February 23, 1999, Sandra Henley, Psychometrist, completed an Interpretive Report of WIAT testing. (Tr. 178-185). As for the validity of testing, Dr. Henley noted that "Amanda's test behavior was marked by distractibility as she sometimes had difficulty staying focused on task." (Tr. 178). Summers reading was below average, math ability was well below average, and language was average.

Summers was also seen by Dr. A. Martin. (Tr. 269-275). On October 1, 2003. Dr Martin wrote that Summers had possibly been molested at age 13 and that the matter had been reported to social services. In addition, Dr. Martin wrote the Summers had been diagnosed with ADHD at age 11. An unsigned and undated Questionnaire was part of Dr. Martin's records. Based on the directions ("Please rate each item according to *your child's* behavior last month"), the form was completed by her mother. (Tr. 272). The parent, Christy Summers, described Summers as being restless or overactive, excitable, impulsive, fails to finishing things he/she starts, inattentive, easily distracted, temper outbursts, fidgeting, disturbs other children, demands must be met immediately–easily frustrated, cries often and easily, and mood changes quickly and drastically. (Tr. 272). Other medical records reveal that on March 13, 2002, Summers was "hit in the head with a hair spray bottle." (Tr. 274). A Quest Diagnostic blood report reveals lead levels in blood. (Tr. 281).

Summers's father completed for his daughter a Function Report on November 11, 2011. (Tr.

8

202-209). According to the Function Report, Summers and her two children live with her father.

With respect to her children, the Function Report states that "my dad and family helps with them."

(Tr. 203). Summers "needs someone with her at all times wherever she goes." (Tr. 203). As for her

daily activities, Summers needs reminders to pay bills and take medicine. (Tr. 204). Her father does

most of the cooking. (Tr. 204). Her dad does most of the housework. (Tr. 204). Summers does no

yard work. (Tr. 205). The Function Report states that Summers rarely goes out and when she does,

she is a passenger in a car. She cannot read street signs to drive. (Tr. 205). Her father does all the

shopping. She does not know how to count money, read or write, or add or subtract. Her father pays

the bills. (Tr. 205). Summers denies having any hobbies. A typical day consists of staying home

with her kids, playing with them and watching TV. (Tr. 206). Her father goes with her and her kids

to doctor appointments. (Tr. 206). The Function Report states: "my dad does everything with me

most of the time." (Tr. 206). The Function Report states that she has no friends. She does not like

being around people. (Tr. 207). The Function Report states that Summers cannot follow

instructions; cannot keep up with others; has difficulty completing tasks, has difficulty

understanding, and getting along with others. (Tr. 207). The Function Report states that Summers

is unable to work because of panic and anxiety attacks and because she "does not do well around a

lot of people." (Tr. 202). In addition, Summers's father completed a form in which he wrote:

> She was in special ed in school and speech therapy and [counseling] in school and
> was on medication. She had trouble taking her [medication.] [Now] she has panic
> attacks and depression and can't be around a lot of people. She can't hardly drive a
> car. She live with me her Daddy to help her out and the kids but she is a very good
> mother to her kids. She just has a lot of problems that stops her from working and
> being around a lot of people and talk to people....(Tr. 261).

On January 6, 2012, Sharon Swanson, Psy.D. completed an evaluation. (Tr. 231-242). At

9

the time of the evaluation Summers was age 21.   According to the report, Summers's chief complaints were emotional and learning difficulties.  (Tr. 232).   By way of background history, Summers reported that she has been diagnosed with ADHD and takes medication.  (Tr. 232).  She also has a learning disability in speech, math and reading. (Tr. 232).  She has a history of depression. (Tr. 232).  Until her children were born, she spent most of the day in bed.  (Tr. 232).  She was born in Alabama.  She reported that she had been molested.  Her mother reported that child protective services had been involved three times.  (Tr. 233).  Summers was hospitalized for depression and nervousness in 2009.  Summers has two children and does not know the identity of the fathers.  She quit school in the 8th grade.  (Tr. 234-235).  With respect to activities of daily living, Dr. Swanson wrote:

> Ms. Summers wakes at 7 o'clock in the morning as her kids wake her up.  She stays at home with her kids and her father.  She indicated that there is nothing really that she does when she is at home.  She showers two times a week and she sometimes does the grocery shopping and the cooking.  She goes to bed around 10.  She indicated that she has difficulties sleeping through the night as the kids wake her up and she worries a lot.  She indicated that she picks up after her children and herself. She indicated that lately she has had difficulties completing tasks since her son has begun crawling and he is into everything.  She indicated that her infant son sleeps through the night and her other son sleeps from 10 pm to around 7 or 8 am.  (Tr. 235).

As for social functioning, Summers "indicated that she hardly ever leaves the house and does not have any friends.  She indicated that she only socializes with her parents and her children."  (Tr. 236).  With respect to completing tasks, Summers reported difficulties in completing tasks.  (Tr. 236).  She reported no episodes of decompensation.  (Tr. 236).  As part of the evaluation, Dr. Swanson conducted a mental status examination.

### Appearance, Behavior, and Speech

Ms. Summers presented with adequate hygiene and maintained adequate eye contact. She had no difficulties noted with her hearing or vision. She was able to hear all of the questions. She was oriented to person and situation. She was aware that it was the 6th of the month; however she did not know what month it was or what year it was. She was unaware of the day of the week. She was aware of the time and was able to read the clock. She was aware of her age and date of birth. She knew her current location and the purpose of the evaluation. No difficulties were noted with her fine or gross motor skills. She presented with no unusual behaviors or mannerisms. No difficulties were noted with her expressive language and some difficulties with her receptive language when complex words were used. She had no perseveration or word finding difficulties. Her speech was normal in rate, intensity, articulation, and volume; however, it is important to note that she had poor grammar. Rapport was easily established and she engaged in spontaneous speech when her mother was not speaking over her. During the interview, her mother chose to join her daughter in the session. Her mother was overbearing and Ms. Summers often let her mother speak until the examiner intervened and asked for Ms. Summers to respond to the questions. Overall, she was judged to have been an adequate informant whose speech pattern and content was basically unremarkable. Overall, she was clearly able to respond in a coherent and appropriate fashion.

### Thought Processes

There was no evidence of any underlying unusual, idiosyncratic, or bizarre ideation, with thought processes clearly rational and goal-directed (no evidence of circumstantiality, tangentially, or looseness of associations). She was unable to interpret any of the five proverbs. She had difficulties grasping similarities between words and concepts, and difficulties using generalizations and abstractions appropriately.

### Thought Content

There was nothing unusual in the content of her thoughts. In this regard there was no evidence of special preoccupations and clearly no delusional or paranoid thinking.

### Perceptual Abnormalities

She denied ever experiencing any type of hallucinatory phenomena, with no concerns about false sensory experiences.

### Mood and Affect

Ms. Summers presented with a dysphoric mood and her affect was consistent with her mood.

**Sensorium and Cognition**

Ms. Summers did not appear confused and was oriented to person and situation. She was aware of the purpose of the evaluation and gave no evidence of confusion. She was unaware of any current events. For her intellectual abilities, refer to the intellectual section.

**Memory**

Remote memory was judged to be fair. She was unable to name the current and past president or the governor. She was unable to recall any of the four words after a five-minute delay. She was easily distracted. She was able to recall one of the four words with the assistance of a categorical prompt and she was able to recall three of the four words with the assistance of a cue. Some difficulties were noted with her working memory but they appeared consistent with her intellectual abilities. She was able to repeat four digits forward and two digits backwards. She was very unsure of herself on the working memory section, which also seemed to negatively impact her abilities to complete the task.

**Concentration**

Overall, concentration was intact. She was very nervous and frustrated with the concentration section due to her insecurity of completing the tasks. She was able to count from 20 to 1 backwards and count by 5's to 100. She had one error when counting from 5's to 100. She was unable to complete serial 7's or serial 3's. She could do simple mental arithmetic consisting of addition but not subtraction, multiplication, or division. She was embarrassed that she was unable to complete the math problems.

**Judgment and Insight**

Judgment and insight for hypothetical situations was poor. (Tr. 236-238).

Dr. Swanson administered two tests: the Wechsler Adult Intelligence-Scale-IV (WAIS-IV) and the Wise Range Achievement Test-4 (WRAT-4) blue test form. Dr. Swanson wrote: "on the WAIS-IV she obtained a full IQ score in the mentally deficient range. Her verbal reasoning abilities: mentally deficient range. Perceptual reasoning ability: borderline range and ability to sustain attention,

concentration and exert mental control:  mentally deficient ability in processing simple or routine

material without making errors:  mentally deficient range." (Tr. 238).   On the second test, "Ms.

Summers had significant difficulties with word reading, sentence comprehension, spelling, reading

comprehension, and mathematics.  Her low academic functioning appears to be commensurate with

her intellectual abilities (WAIS-IV). "  Based on her interview, mental status exam and testing, Dr.

Swanson opined:

> Discussion
>
> Results across all assessment measures suggest limited intellectual abilities and
> academic functioning.  Ms. Summers may experience difficulties with abstract and
> verbal reasoning, nonverbal reasoning, inductive and spatial reasoning as well as
> nonverbal abstract problem solving.   She exhibits difficulties with attention,
> concentration, and mental control, as well as attention and working memory.  Her
> visual perception, visual-motor coordination, and motor and mental speed are also
> impaired (as per assessment with the WAIS-IV).  An area of strength was noted in
> her ability to deal with spatial perception, visual abstract processing and problem
> solving.  Test results appear to be consistent with her reported history. (Tr. 239).

She assessed a GAF score of 50[2] and opined that the prognosis was "poor." (Tr. 239).

On February 2, 2012, a disability determination unit physician completed a Psychiatric

Review Technique. (Tr. 243-255).  Dr. Lankford opined that Summers has moderate restriction of

activities of daily living and difficulties in maintaining concentration, persistence or pace.  He further

---

[2] The Global Assessment of Functioning Scale ("GAF") scale is used to rate an
individual's "overall psychological functioning." Am. Psychiatric Ass'n, *Diagnostic &
Statistical Manual of Mental Disorders* 32 (4ed. Text Revision 2000).  The GAF is a 100-point
scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score
to a person's psychological, social, and occupational functioning.  A GAF of 41 to 50 indicates  a
"serious impairment in social, occupational, or school functioning (e.g. suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR serious symptoms (e.g., no friends, unable to keep a
job). *Id.* at 34.  The scale has been dropped in the most recent edition of the *Diagnostic &
Statistical Manual of Mental Disorders*.  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual
of Mental Disorders* 16 (5th ed. 2013).

found that she has mild restrictions in maintaining social functioning and no episodes of decompensation. Dr. Lankford also completed a Mental Residual Functional Capacity Assessment. (Tr. 257-259). Dr. Lankford opined that Summers has no significant limitations in the following areas: the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to change in the work setting; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. Dr. Lankford further opined that Summers has moderate limitations in the in the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to maintain attention and concentration for extended periods. Dr. Lankford opined that Summers has marked limitations in the ability to carry out detailed instructions and to understand and remember detailed instructions. Based on the above, Dr. Lankford opined that Summers had

the mental RFC to "understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to change in routine work settings." (Tr. 259). Dr. Lankford clarified and amplified on his RFC assessment as follows:

> The [claimant] is able to understand, remember and carry out simple instructions, make simple decisions, [concentrate] to extended periods, interact with others, and respond to others. The [claimant] could adhere to a schedule and persist on [] (sic) tasks to completion at an adequate pace. The [claimant] would not be able to perform at a pressured pace, could interact with others in at least a superficial fashion, but would function best in a setting where frequent, close interactions with others would not be required. (Tr. 259).

There are also records that she was treated for a kidney stone on or about March 14, 2009, and July 9, 2009, and had a CT of the abdomen. (Tr. 308-310, 312-313). Summers had an x-ray of her foot on March 31, 2009. (Tr. 314-315). On June 5, 2011, Summers received medical attention for vomiting. (Tr. 298-307). She gave birth to a baby on December 15, 2011. (Tr. 295-297). Lastly, on January 29, 2013, she was treated for a tooth ache. (Tr. 286-293).

Summers did not appear at any of the scheduled hearings, and therefore did not testify about her health and its impact on her daily activities.

The ALJ asked the vocational expert, Herman Litt, the following hypothetical questions at the March 6, 2013 hearing:

> Q. Mr. Litt. Assume an individual is the same age as the claimant and same education and work experience. She has no exceptional limitations and can perform work at all exceptional levels, as defined by Social Security Administration regulations. She is limited to simple, routine tasks that require no more than occasional contact with the public. She cannot work at fast-paced assembly-type production jobs. . . . And she cannot work in any job that requires reading or writing above the first grade level. Would there be any work for such an individual? (Tr. 36).

15

Based on this hypothetical, the VE testified that Summers could perform work as an officer cleaner,

dishwasher, laundry press operator. (Tr. 37). The ALJ followed up with a second hypothetical

question:

> Q. Thank you. Assume the same individual, but I want you to add that she's unable
> to maintain sustained concentration, persistence, or pace, would have trouble
> maintaining attendance standards, and would not be able to complete a normal work
> day or work week without interruptions from psychologically-based symptoms. She
> is capable of tolerating only very low levels of stress, must work in a stable
> environment with few changes in routine, and can have contact with the public. Any
> jobs?
>
> A. No, your honor. (Tr. 37).

Summers's counsel also posed several hypothetical questions to the VE:

> Q. Assume a hypothetical individual would not be able to follow simple instructions.
> Meaning one-or two-step instructions. Would there be any jobs in the national
> economy such an individual could perform?
>
> A. No.
>
> Q. Assume a hypothetical individual could not sustain attention and concentration
> to complete a task in a timely manner. Would there be any jobs in the national
> economy such an individual could perform?
>
> A. No. (Tr. 38).
>
>        *               *             *
>
> Q. Assume that the hypothetical individual could not sustain an ordinary routine
> without special supervision. And we're speaking about on the job. Would there be
> any jobs in the national economy such an individual could perform? And the special
> supervision was constant.
>
> A. No, that would be more of a sheltered situation, so I don't believe it would be a
> job in a competitive employment she could perform.
>
> Q. And assume that the hypothetical individual could not interact appropriately with
> co-workers. Would there be any jobs in the national economy such an individual
> could perform, eight hours a day, five days a week, 52 weeks a year, on a sustained

basis?

A.  No.

Q.  And assume that the hypothetical individual could not get along with co-workers without distracting them or exhibiting extreme behaviors.  Would there be any jobs in the national economy such an individual could perform, eight hours a day, five days a week, 52 weeks a year, on a sustained basis?

A.  No.

Q.  Would an illiterate person be able to perform any of the three jobs you enumerated on the administrative law judge's hypothetical?

A.  Yeah, it doesn't take any literacy to do the jobs.  (Tr. 49-50).

Summers argues that ALJ erred in failing to find that her mental impairment meets or equals Listing 12.05C. Summers argues she should have been found disabled under listing 12.05C because her valid IQ scores are within the required range, and her mental impairments impose additional and significant work-related limitation of function. Summers argues that she met the diagnostic criteria of the introductory paragraph of Listing 12.05, i.e, that deficits of adaptive functioning, the onset of which occurred before she reached age 22. The Commissioner counters that the ALJ's determination is supported by substantial evidence.  The Commissioner argues that the ALJ properly found that Summers IQ scores from 1998 as a youth, which indicated a higher level of intellectual functioning than the scores from 2012.  The ALJ found the earlier scores were more reliable since there was no evidence of a traumatic brain injury between 1998 and 2012, which the ALJ suggests would explain the difference between the two test results.

Listing 12.05, which pertains to "intellectual disability," provides:

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the

17

impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded: or

B. A valid verbal, performance, or full scale IQ score of 59 or less; or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or

D. A valid verbal, performance or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.05. To satisfy this listing, the claimant must satisfy the diagnostic elements of the introductory paragraph as well as the specific factors of paragraph A, B, C, or D. *See McCaskill v. Dept. of Health and Human Services,* No. 15-60304, ___Fed. Appx. ___, 2016 WL 700220 (5th Cir. Feb. 22, 2016)*; Randall v. Astrue,* 570 F.3d 651, 659-60 (5th Cir. 2009); *Arce v. Barnhart,* 185 Fed. App'x 437, 438, 2006 WL 1768599 (5th Cir. 2006).

Here, the record shows that Summers achieved a verbal comprehension score of 61, a perceptual reasoning score of 75, a working memory score of 63, a processing speed score of 53, and a full scale IQ score of 58 on a formal intelligence test administered by Dr. Swanson on January 6, 2012. While the ALJ noted that Summers's scores were low and fell in the "mentally deficient

range," she discounted the scores because she found them not to be a "comprehensive evaluation of her true intellectual functioning." Instead the ALJ relied on testing performed in 1998 using a different test, the Wechsler Intelligence Scale for Children-III. The 1998 test resulted in a full scale IQ of 99, which was in the average range. The ALJ found that the "IQ scores as a youth indicate a higher level of intellectual functioning that does not comport with the significant drop in her IQ scores as an adult. There is no evidence of any traumatic brain injury between 1998 and 2012 to explain the difference in IQ scores between the two tests in the record." (Tr. 22).

The law is clear that the ALJ may make factual determinations on the validity of IQ scores and may discount an IQ score as invalid where there is substantial evidence in the record to support the conclusion. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). For example, the ALJ may not fully credit them if there is evidence showing they are unreliable, invalid, or inconsistent with other evidence in the record. *Cole v. Barnhart*, 69 Fed. App'x 658, 2003 WL 21336021 (5th Cir. 2003). That said, "because ALJ's [sic] are not physicians they may not hastily reject I.Q. scores." *Carr v. Astrue*, Civ. No. 1:06cv318-SA-DAS, 2008 WL 4326344, at *4 (N.D.Miss. Sept. 22, 2008)(reversing and remanding where ALJ provided no discussion regarding the validity of claimant's IQ scores). The record shows that Dr. Swanson did not question the validity of Summers's test scores due to malingering, lack of effort, or any other reason. Moreover, the earlier test, as noted by the ALL, was not the same the test administered by Dr. Swanson. Furthermore, Dr. Swanson administered two tests and performed a mental status examination. As noted by Dr. Swanson, "results across all assessment measures suggest limited intellectual abilities and academic functioning" (Tr. 239). Upon this record, the ALJ's reasons for discounting Summer's IQ scores as invalid are not supported by substantial evidence. That said, the IQ scores, standing alone, do not

evidence that Summers, prior to age 22, had "significantly subaverage general intellectual functioning with deficits in adaptive functioning." *See Parker v. Astrue*, Civil Action No. 11-294-SCR, 2012 WL 5384821, *4 (M.D.La. Nov. 1, 2012)("the mere existence of IQ scores which satisfy the first part of paragraph C, along with a limited or special education" are insufficient, in and of themselves, to "demonstrate [ ] deficiencies in adaptive functioning initially manifested during the developmental period, that is, onset of the impairment before age 22"); *Potts v. Astrue*, Civil Action No. H-12-cv-229, 2013 WL 5785659, *8 (S.D.Tex. Feb. 19, 2013)(claimant's "poor performance in school, his past history as a special education student, and his illiteracy" are insufficient to meet his burden of establishing a "deficient in adaptive functioning" as required by Listing 12.05(C).

Listing 12.05 does not define "adaptive functioning." The Fifth Circuit Court of Appeals has held that the definition of "adaptive functioning" found in § 12.00(C)(1) may be used. Thus activities "such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office" encompass adaptive activities. *Arce v. Barnhart,* 185 Fed. Appx. 437 (5th Cir. 2006).

Substantial evidence suggests that Summers meets the diagnostic criteria of the introductory paragraph of Listing 12.05, i.e, that significantly subaverage general intellectual functioning with deficits in adaptive functioning, the onset of which occurred before she reached 22 years of age. The ALJ found that Summers had not shown deficits in adaptive functioning because she tends to her personal care, cares for her toddler children, can prepare simple meals and perform household chores. The record reveals that Summers attended school until the eighth grade. Her reading, spelling, and math abilities are only on the first and second grade levels. While she had personal

relationships as evidenced by her children, the record shows that she does not know the identity of either child's father. She and her children live with her father and apparently she has never maintained a separate residence. She has no relevant past work. She does not drive because she cannot read the signs. The Function Report was completed by her father and it appears that he assists/supervises many of the household chores including doing most of the cooking, cleaning the house, yard work, shopping, and taking Summers and her children to the doctor. She does not know how to count money, read or write or subtract. Her father pays the bills. While Summers, on occasion, might be able to use a microwave and make a sandwich, these activities do not lessen the areas where she has significant deficits. Simply put: "my dad does everything with me most of the time." (Tr. 206). Dr. Swanson's evaluation corroborates the Function Report.   With respect to activities of daily living, Summers's reported that "there is nothing really that she does when she is home." (Tr. 235). The ALJ"s decision overstates Summers's level of adaptive functioning. Moreover, the ALJ recognized that Summers has moderate restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence or pace, which indicates that Summers suffers at least some level of deficits in his adaptive functioning. *See Pritchett v. Comm. Soc. Sec. Admin.* No. 3:11cv-319-3F (N.D. Tex. Mar. 29, 2012), 2012 WL 1058123, at *7 (the ALJ's finding "that Plaintiff's intellectual functioning caused a moderate effect on her ability to perform daily activities . . . [made] apparent that the ALL at least recognized some deficits in Plaintiff's adaptive functioning"). Here, the totality of the record, including the results of Dr. Swanson's consultative examination, her records from Alabama, the Function Report, contain significant evidence of deficits in adaptative functioning, which undermine the ALJ's step three determination. Thus the matter must be remanded so the Commissioner can

evaluate whether Summers meets or equals the requirements of Listing 12.05C under the correct

legal standard, and proceed with the other steps in the five-step sequential evaluation process if

necessary. Because the matter must be remanded at step three, the Court need not reach Summers's

challenge to the RFC assessment[3].

## V. Conclusion

Based on the foregoing, and the conclusion that the ALJ erred by failing to consider all the

medical evidence, and that the ALJ's step three determination is not supported by substantial

evidence, further development of the record is necessary, and that based on these infirmities in the

ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge

ORDERS that Defendant's Motion for Summary Judgment (Document No. 12), is

DENIED, that Plaintiff's Motion for Summary Judgment (Document No. 21) is GRANTED, and that

this case is REMANDED to the Social Security Administration pursuant to Sentence four of 42

U.S.C. §405(g), for further proceedings consistent with this Memorandum and Order

---

[3] With respect to the ALJ's RFC determination, the undersigned Magistrate Judge notes that the ALJ expressly relied on the mental RFC assessment of disability determination unit physician, Dr. Lankford. Dr. Lankford opined that Summers had the mental RFC to "understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to change in routine work settings." (Tr. 259). The ALJ included most of Dr. Lankford's assessment and limited Summers's to occasional contact with the public. However, Dr. Lankford, clarified and amplified his RFC when he wrote that Summers' could interact with others in at least a superficial fashion, but would function best in a setting where frequent, close interactions with others would not be required." (Tr. 259). This caveat appears to be more restrictive than his RFC and that of the ALJ who limited Summers to occasional contact with the public. Should the matter proceed beyond step three, the ALJ should address the difference.

Signed at Houston, Texas, this 20th day of _____July_____, 2016

_____
FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE